**THE ROSEN LAW FIRM, P.A.**
Laurence M. Rosen, Esq.
609 W. South Orange Avenue, Suite 2P
South Orange, NJ 07079
Tel: (973) 313-1887
Fax: (973) 833-0399
Email: lrosen@rosenlegal.com

*Co-Lead Counsel for Lead Plaintiffs*

Additional Counsel on Signature Page

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| IN RE: ELECTRONICS FOR IMAGING, INC. SECURITIES LITIGATION | Case No. 2:17-cv-05992-MCA-MAH<br><br>**AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS**<br><br>**JURY TRIAL DEMANDED** |

Lead Plaintiffs Anthony Pipitone and Donald B. Cork ("Plaintiffs"), individually and on behalf of all other persons similarly situated, by their undersigned attorneys, for their Amended Class Action Complaint for Violations of the Federal Securities Laws against Defendants (defined below), alleges the following based upon personal knowledge as to themselves and their own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through their attorneys, which included, among other things, a review of the Defendants' public statements, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Electronics For Imaging, Inc. ("EFI" or the "Company"), analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiffs

believe that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

**NATURE OF THE ACTION**

1. After the close of the market on August 3, 2017, EFI, a global provider of digital printing technologies, announced that the Company would be delaying its scheduled release of its financial results for the second fiscal quarter of 2017 because it had launched an internal investigation into the effectiveness of the Company's current and historical disclosure controls and internal control over financial reporting. EFI also revealed that it expected to report a material weakness in internal control over financial reporting and that its disclosure controls were not effective in prior periods. Upon discovering the existence of investors sent the Company's stock price plummeting. At the end of trading on August 4, 2017, EFI's shares were down 45% from the prior day, closing at $26.05.

2. During the Class Period, Defendants assured investors that, under the supervision and with the participation of EFI's management, they had engaged in a "comprehensive effort to review, evaluate, and improve our controls," conducting evaluations of the effectiveness of the design and operations of the Company's disclosure controls and procedures as well as its internal control over financial reporting. As a result of such efforts, Defendants stated in SEC annual and quarterly reports filed with the SEC during the Class Period that their disclosure controls and procedures and internal control over financial reporting were effective.

3. As Defendants later disclosed, however, EFI's disclosure controls and procedures and internal control over financial reporting were not effective. Rather, the Company's internal controls had not been designed to ensure that any operational changes, which may impact its accounting treatment of revenue, were appropriately and timely evaluated. Nor did the Company

sufficiently staff its critical corporate functions, with appropriate levels of experience and training, to allow for the adequate monitoring and timely communication of operational changes, including those which may impact the preparation of its financial statements.

4. The severity and pervasiveness of the flaws in EFI's internal controls caused Defendants to engage in an extraordinary effort to identify and remedy them, forcing Defendants to reallocate valuable staff resources and resulting in serious financial harm to the Company and its shareholders. According to Defendants, themselves, the "internal distraction" caused by the Company's assessment of its controls during the third quarter of 2017 was one of the primary factors in EFI's recording of its "worst conversion rate of any quarter in recent memory," with many customer deals that were expected to close by quarter's end ultimately left short of completion. For that quarter, the Company reported, among other things, GAAP[1] net income of just $1.9 million, which was down 89% when compared to the $17.7 million in GAAP net income reported by the Company for the same period in 2016.

5. As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiffs and other Class members have suffered significant losses and damages. This federal securities class action is brought on behalf of a Class consisting of all persons and entities, other than Defendants and their affiliates, who purchased or otherwise acquired the publically traded securities of EFI from February 22, 2017 through August 3, 2017, both dates inclusive (the "Class Period"), against the Defendants, seeking to recover damages caused by Defendants' violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder.

[1] Generally Accepted Accounting Principles.

## JURISDICTION AND VENUE

6. The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. § 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 8 240.10b-5).

7. This Court has jurisdiction over the subject matter of this action pursuant to § 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331.

8. Venue is proper in this District pursuant to §27 of the Exchange Act, 15 U.S.C. §78aa and 28 U.S.C. §1391(b), as the Company's securities are traded in this Judicial District.

9. In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

10. Plaintiff Anthony Pipitone, as set forth in the certification attached to his Motion to Appoint Lead Plaintiff (ECF No. 10-2), purchased EFI securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures.

11. Plaintiff Donald B. Cork, as set forth in the certification attached to his Motion to Appoint Lead Plaintiff (ECF No. 11-4), purchased EFI securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures.

12. Defendant EFI is a Delaware corporation headquartered in Fremont, California. EFI securities trade on the NASDAQ Global Select Market ("NASDAQ") under the ticker symbol "EFII."

13. Defendant Guy Gecht ("Gecht") served as the Company's Chief Executive Officer throughout the Class Period. Gecht joined EFI in 1995 and was named CEO in January 2000. Prior

to being named EFI's CEO, Gecht served as President of the Company. From 1996-1999, Gecht led engineering efforts for the Company's largest product line, Fiery Servers Division, culminating as Vice President, Fiery General Manager.

14. Defendant Marc Olin ("Olin") served as the Company's Chief Financial Officer throughout the Class Period. Prior to joining EFI, Olin was CEO and co-founder of Printcafe Software, a public company EFI acquired in 2003. Prior to being named EFI's CFO in April 2015, Olin served as EFI's interim CFO from September 2013 through January 2014 and then as the Company's COO beginning in January 2014.

15. Defendants Gecht and Olin are sometimes referred to herein as the "Individual Defendants."

16. Each of the Individual Defendants:

a. directly participated in the management of the Company;

b. directly participated on each earnings call the Company conducted during the Class Period;

c. was directly involved in the day-to-day operations of the Company at the highest levels;

d. was privy to confidential proprietary information concerning the Company and its business and operations;

e. was directly or indirectly involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein;

f. was directly or indirectly involved in the oversight or implementation of the Company's internal controls;

g. was aware of or recklessly disregarded the fact that the false and misleading statements were being issued concerning the Company; and/or

h. approved or ratified these statements in violation of the federal securities laws.

17. EFI is liable for the acts of the Individual Defendants and its employees under the doctrine of respondeat superior and common law principles of agency as all of the wrongful acts complained of herein were carried out within the scope of their employment with authorization.

18. The scienter of the Individual Defendants and other employees and agents of the Company is similarly imputed to EFI under respondeat superior and agency principles.

19. Defendant EFI and the Individual Defendants are referred to herein, collectively, as the "Defendants."

**SUBSTANTIVE ALLEGATIONS**

**Background**

20. EFI was incorporated in Delaware in 1988 and commenced operations in 1989. It maintains its corporate headquarters in Fremont, California. It completed its initial public offering of common stock in 1992.

21. EFI touts itself as "a world leader in customer-centric digital printing innovation focused on the transformation of the printing, packaging, ceramic tile decoration, and textile industries from the use of traditional analog based printing to digital on-demand printing."

22. EFI's product portfolio includes the following: "industrial super-wide and wide format digital inkjet products ('Industrial Inkjet') including VUTEk and Matan display graphics super-wide and wide format, Reggiani textile, Jetrion label and packaging, and Cretaprint ceramic tile decoration and construction material industrial digital inkjet printers and ink; print production workflow, web-to-print, cross-media marketing, Optitex textile two-dimensional ('2D') and

three-dimensional ('3D') computer aided fashion design ('CAD') applications, and business process automation software ('Productivity Software'), which provides corporate printing, label and packaging, publishing, and mailing and fulfillment solutions for the printing and packaging industry; and Fiery DFEs ('Fiery')."

**EFI's Ineffective Disclosure Controls & Procedures and "Material Weaknesses" in Internal Control Over Financial Reporting**

23. Defendants are responsible for establishing and maintaining "disclosure controls and procedures," as defined in Rule 13a-15(e) and 15d-15(e) of the Exchange Act, that are designed to provide reasonable assurance that information required to be disclosed by EFI in reports that the Company files or submits under the Exchange Act is recorded, processed, summarized, and reported within the time periods specified in SEC rules and forms, and that such information is accumulated and communicated to the Individual Defendants to allow for timely decisions regarding required disclosure.

24. Defendants also are responsible for establishing and maintaining adequate internal control over financial reporting as defined in Rule 13a-15(f) of the Exchange Act. A company's internal control over financial reporting is a process designed by, or under the supervision of, the company's principal executive and principal financial officers, or persons performing similar functions, and effected by the company's board of directors, management, and other personnel to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. A company's internal control over financial reporting includes those policies and procedures that (1) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company; (2) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements

in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and (3) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the Company's assets that could have a material effect on the financial statements.

25. During the Class Period, Defendants failed to comply with such obligations under the Exchange Act and the rules promulgated thereunder. Indeed, the deficiencies in EFI's internal controls and procedures and internal control over financial reporting were so pervasive as to require Defendants to reallocate the Company's staffing resources in connection with EFI's internal assessment of such controls, resulting in the Company's reporting of "clearly disappoint[ing]" financial results for the third fiscal quarter of 2017.

26. Defendants' internal controls were not designed effectively to ensure that operational changes that may impact accounting treatment would be properly and timely evaluated. Defendants also did not allocate sufficient staff corporate functions charged with monitoring and communicating such operational changes or provide such staff with appropriate levels of experience and training.

27. On September 11, 2017, Defendants hosted a conference call (the "September 11 Call") to discuss the Company's results for 2Q 2017. During the September 11 Call, Defendants revealed that they had conducted a "very thorough review," which made for a "very difficult time for our entire organization." The internal review, according to Defendant Olin, involved "many people across our legal, operations and finance teams, together with our outside counsel and external professional consultants."

28. On October 26, 2017, the Company issued a press release (the "October 26 Press Release") disclosing its financial results for the third quarter ended September 30, 2017. In the October 26 Press Release, the Company quoted Defendant Gecht as stating, "We are clearly disappointed in the third quarter results, which fell below our expectations largely due to delayed deals in our direct business." The Company reported: GAAP net income of $1.9 million, down 89% compared to $17.7 million for the same period in 2016 or $0.04 per diluted share, down 89% compared to $0.37 per diluted share for the same period in 2016; non-GAAP net income of $22.7 million, down 18% compared to non-GAAP net income of $27.6 million for the same period in 2016 or $0.48 per diluted share, down 17% compared to $0.58 per diluted share for the same period in 2016; and cash flow from operating activities of $3.4 million, down 86% compared to $24.0 million during the same period in 2016.

29. Later that same day, on October 26, 2017, Defendants hosted a conference call (the "October 26 Call") to discuss the Company's results for 3Q 2017. During the October 26 Call, Defendants stated that "a number of deals that got pushed out" was primarily behind the "very disappointing" 3Q 2017 results. Defendant Gecht told analysts on the October 26 Call that "a large number of inkjet and software deals that were in our pipeline and we expected to close late in the quarter did not close." Defendant Gecht explained that the Company had "the worst conversion rate of any quarter in recent memory," and that there were "three main reasons" for this. Among those reasons was the existence of "internal distraction" caused by the Company's assessment of its revenue recognition practices and internal controls "during the summer." Although the Company had "fought any [such] distraction," according to Defendant Gecht, the "focusing process" implicated by the internal review, combined with the fact that "our team members and

customers" were "waiting to see the results of the internal review," "added some noise" that prevented many of the Company's anticipated deals from closing at the end of the quarter.

**Materially False and Misleading Statements Issued During the Class Period**

30. The Class Period starts on February 22, 2017, when the Company filed with the SEC its annual report on Form 10-K (the "2016 10-K"), reporting its financial results for the 2016 fiscal year.

31. The 2016 10-K stated as follows: "Based on their evaluation as of the end of the period covered by this Annual Report on Form 10-K, our Chief Executive Officer and Chief Financial Officer have concluded that our disclosure controls and procedures were effective to provide reasonable assurance as of December 31, 2016." 2016 10-K at 147. The 2016 10-K also stated: "Based on our assessment using those criteria [set forth by the Committee of Sponsoring organizations of the Treadway Commission ("COSO") in Internal Control—Integrated Framework (2013)], we concluded that our internal control over financial reporting was effective as of December 31, 2016." 2016 10-K at 148.

32. The foregoing statements made in the 2016 10-K were materially false and misleading. Defendants knew or were reckless in not knowing that, as Defendants stated in Amendment No. 1 to the 2016 10-K, which was filed with the SEC on September 11, 2017, EFI's "disclosure controls and procedures were not effective as of December 31, 2016," based on the existence of certain "material weaknesses in internal control over financial reporting."[2] In addition,

[2] The Company defines a "material weakness" as "a deficiency, or combination of deficiencies, in internal control over financial reporting such that there is a reasonable possibility that a material misstatement of our annual or interim financial statements will not be prevented or detected in a timely basis." Defendants explained: "Because the deficiencies identified could result in a misstatement of revenue, inventory, and related accounts and associated disclosures that could be material to the annual or interim consolidated financial statements, such deficiencies represent material weaknesses in our internal control over financial reporting."

Defendants stated that the Company's internal control over financial reporting was "not effective," given the existence of certain "material weaknesses." Defendants stated: "Specifically, our internal controls were not designed effectively to ensure that operational changes, which may impact revenue recognition, were appropriately and timely evaluated to determine the accounting impact; and we did not sufficiently staff, with appropriate levels of experience and training, to allow for the adequate monitoring and timely communication of operational changes, including those which may impact revenue recognition on an on-going basis. This resulted in management not timely identifying and evaluating the appropriate period of recognition for certain revenue transactions related to printers distributed from a single location, which should have been evaluated in accordance with the bill and hold revenue recognition guidance." According to Defendants, "[a] material weakness is a deficiency, or combination of deficiencies, in internal control over financial reporting such that there is a reasonable possibility that a material misstatement of our annual or interim financial statements will not be prevented or detected in a timely basis. Because the deficiencies identified could result in a misstatement of revenue and disclosures that could be material to the annual or interim consolidated financial statements, such deficiencies represent a material weakness in our internal control over financial reporting. Accordingly, management has revised its report on internal control over financial reporting." "Following the identification of the foregoing material weaknesses," according to Defendants, "management commenced implementation of a remediation plan, which is ongoing. Management believes that the implementation of this plan will remediate the material weaknesses described above. The following steps of the remediation plan are currently in process, and management may determine to enhance existing controls and/or implement additional controls as the implementation progresses: design and implement controls to properly identify, evaluate and monitor operational

changes which may impact revenue recognition; evaluate the sufficiency, experience, and training of our internal personnel and hire additional personnel or use external resources; design and implement controls related to the approval and accounting for any bill and hold transactions; and direct our internal auditors to perform additional testing of revenue transactions to ensure the sufficiency of our remediation efforts."

33. Defendants also knew or were reckless in not knowing that, as Defendants stated in Amendment No. 2 to the 2016 10-K, which was filed with the SEC on November 27, 2017, EFI's "disclosure controls and procedures were not effective as of December 31, 2016," based on the existence of certain "material weaknesses in internal control over financial reporting." Defendants stated: "Our management determined that, as of December 31, 2016, the following material weaknesses existed in our internal control over financial reporting: (1) Our internal controls were not designed effectively to ensure that operational changes, which may impact revenue recognition, were appropriately and timely evaluated to determine the accounting impact. (2) We did not sufficiently staff, with appropriate levels of experience and training, to allow for the adequate monitoring and timely communication of operational changes, including those which may impact revenue recognition on an ongoing basis. (3) Our internal control over excess and obsolete, finished goods printer inventory reserves at our Italian manufacturing subsidiary was not designed effectively to conduct a sufficiently precise evaluation of the classification, condition, and salability of each printer and the cost accounting department was not staffed sufficiently to mitigate limitations relating to these reserves in the ERP system used solely at this subsidiary." Defendants explained: "Items #1 and #2 resulted in management not timely identifying and evaluating the appropriate period of recognition for certain revenue transactions related to printers distributed from a single location, which should have been evaluated in accordance with the bill

and hold revenue recognition guidance. Item #3 resulted in management not timely evaluating the appropriate period of de-recognition of certain printer inventory manufactured at our Italian manufacturing subsidiary, which should have been subject to an excess and obsolescence impairment or reclassification and depreciation." "Following the identification of the foregoing material weakness," Defendants stated, management commenced implementation of a remediation plan, which is ongoing. Management believes that the implementation of this plan will remediate the material weaknesses described above. The following steps of the remediation plan are currently in process, and management may determine to enhance existing controls and/or implement additional controls as the implementation progresses: design and implement controls to properly identify, evaluate and monitor operational changes which may impact revenue recognition; evaluate the sufficiency, experience, and training of our internal personnel and hire additional personnel or use external resources; design and implement controls related to the approval and accounting for any bill and hold transactions; design and implement controls to evaluate excess and obsolete inventory reserves at our Italian subsidiary; and direct our internal auditors to perform additional testing of revenue transactions to ensure the sufficiency of our remediation efforts."

34. Defendants appended to the 2016 10-K a "Certification Pursuant to Section 302 of the Sarbanes-Oxley Act of 2002" from Defendants Gecht and Olin (the "§ 302 Certifications"), stating the following:

> 1. I have reviewed this annual report on Form 10-K of Electronics For Imaging, Inc.;
>
> 2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)), for the registrant and have:

(a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

(b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

(c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors

> and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):
>
> (a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and
>
> (b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

35. The foregoing statements made in the § 302 Certifications were materially false and misleading for the same reasons stated in ¶¶32, 33.

36. In addition, Defendants appended to the 2016 10-K a "Certification Pursuant to 18 U.S.C. Section 1350, as Adopted Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002" from Defendants Gecht and Olin (the "§ 906 Certifications"), stating the following:

> In connection with the accompanying Annual Report of Electronics For Imaging, Inc. (the "Company"), on Form 10-K for the year ended December 31, 2016 (the "Report"), I, Guy Gecht, Chief Executive Officer of the Company, hereby certify pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 that: (1) the Report fully complies with the requirements of section 13(a) or 15(d) of the Securities Exchange Act of 1934, as amended; and (2) the information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

37. The foregoing statements made in the § 906 Certifications were materially false and misleading for the same reasons stated in ¶¶32, 33.

38. On May 2, 2017, when the Company filed with the SEC its quarterly report on Form 10-Q (the "1Q 10-Q"), reporting its financial results for the first fiscal quarter of 2017.

39. The 1Q 10-Q stated as follows: "As of the quarter ended March 31, 2017, under the supervision and with the participation of our management, including our chief executive officer

and chief financial officer, we conducted an evaluation of the effectiveness of the design and operation of our disclosure controls and procedures, as such term is defined in Rule 13a-15(e) and Rule 15d-15(e)promulgated under the Securities Exchange Act of 1934, as amended (the "Exchange Act"). Based on that evaluation, our chief executive officer and chief financial and accounting officer concluded that our disclosure controls and procedures were effective as of March 31, 2017 to ensure that information we are required to disclose in reports that we file or submit under the Exchange Act is (i) recorded, processed, summarized, and reported within the time periods specified in SEC rules and forms, and (ii) accumulated and communicated to our management, including our chief executive officer and chief financial and accounting officer, as appropriate to allow timely decisions regarding required disclosure." The 1Q 10-Q also stated: "During the first quarter of 2017, there were no changes in our internal control over financial reporting or in other factors that have materially affected, or are reasonably likely to materially affect, our internal controls over financial reporting."

40. The foregoing statements made in the 1Q 10-Q were materially false and misleading. Defendants knew or were reckless in not knowing that, as Defendants stated in Amendment No. 1 to the 1Q 10-Q, which was filed with the SEC on September 11, 2017, EFI's "disclosure controls and procedures were not effective as of December 31, 2016," based on the existence of certain "material weaknesses in internal control over financial reporting." In addition, Defendants stated that the Company's internal control over financial reporting was "not effective," given the existence of certain "material weaknesses." Defendants stated: "Specifically, our internal controls were not designed effectively to ensure that operational changes, which may impact revenue recognition, were appropriately and timely evaluated to determine the accounting impact; and we did not sufficiently staff, with appropriate levels of experience and training, to allow for

the adequate monitoring and timely communication of operational changes, including those which may impact revenue recognition on an on-going basis. This resulted in management not timely identifying and evaluating the appropriate period of recognition for certain revenue transactions related to printers distributed from a single location, which should have been evaluated in accordance with the bill and hold revenue recognition guidance." According to Defendants, "[a] material weakness is a deficiency, or combination of deficiencies, in internal control over financial reporting such that there is a reasonable possibility that a material misstatement of our annual or interim financial statements will not be prevented or detected in a timely basis. Because the deficiencies identified could result in a misstatement of revenue and disclosures that could be material to the annual or interim consolidated financial statements, such deficiencies represent a material weakness in our internal control over financial reporting. Accordingly, management has revised its report on internal control over financial reporting." "Following the identification of the foregoing material weaknesses," according to Defendants, "management commenced implementation of a remediation plan, which is ongoing. Management believes that the implementation of this plan will remediate the material weaknesses described above. The following steps of the remediation plan are currently in process, and management may determine to enhance existing controls and/or implement additional controls as the implementation progresses: design and implement controls to properly identify, evaluate and monitor operational changes which may impact revenue recognition; evaluate the sufficiency, experience, and training of our internal personnel and hire additional personnel or use external resources; design and implement controls related to the approval and accounting for any bill and hold transactions; and direct our internal auditors to perform additional testing of revenue transactions to ensure the sufficiency of our remediation efforts."

41. Defendants also knew or were reckless in not knowing that, as Defendants stated in Amendment No. 2 to the 1Q 10-Q, which was filed with the SEC on November 27, 2017, EFI's "disclosure controls and procedures were not effective as of December 31, 2016," based on the existence of certain "material weaknesses in internal control over financial reporting." Defendants stated: "Our management determined that, as of December 31, 2016, the following material weaknesses existed in our internal control over financial reporting: (1) Our internal controls were not designed effectively to ensure that operational changes, which may impact revenue recognition, were appropriately and timely evaluated to determine the accounting impact. (2) We did not sufficiently staff, with appropriate levels of experience and training, to allow for the adequate monitoring and timely communication of operational changes, including those which may impact revenue recognition on an ongoing basis. (3) Our internal control over excess and obsolete, finished goods printer inventory reserves at our Italian manufacturing subsidiary was not designed effectively to conduct a sufficiently precise evaluation of the classification, condition, and salability of each printer and the cost accounting department was not staffed sufficiently to mitigate limitations relating to these reserves in the ERP system used solely at this subsidiary." Defendants explained: "Items #1 and #2 resulted in management not timely identifying and evaluating the appropriate period of recognition for certain revenue transactions related to printers distributed from a single location, which should have been evaluated in accordance with the bill and hold revenue recognition guidance. Item #3 resulted in management not timely evaluating the appropriate period of de-recognition of certain printer inventory manufactured at our Italian manufacturing subsidiary, which should have been subject to an excess and obsolescence impairment or reclassification and depreciation." "Following the identification of the foregoing material weakness," Defendants stated, management commenced implementation of a remediation

plan, which is ongoing. Management believes that the implementation of this plan will remediate the material weaknesses described above. The following steps of the remediation plan are currently in process, and management may determine to enhance existing controls and/or implement additional controls as the implementation progresses: design and implement controls to properly identify, evaluate and monitor operational changes which may impact revenue recognition; evaluate the sufficiency, experience, and training of our internal personnel and hire additional personnel or use external resources; design and implement controls related to the approval and accounting for any bill and hold transactions; design and implement controls to evaluate excess and obsolete inventory reserves at our Italian subsidiary; and direct our internal auditors to perform additional testing of revenue transactions to ensure the sufficiency of our remediation efforts."

42. Defendants appended to the 1Q 10-Q certifications substantially similar to the § 302 Certifications. *See* 1Q 10-Q at Exs. 31.1, 31.2.

43. The foregoing statements made in the 1Q 10-Q certifications referenced above in ¶42 were materially false and misleading for the same reasons stated in ¶¶40, 41.

44. In addition, Defendants appended to the 1Q 10-Q certifications substantially similar to the § 906 Certifications. *See* 1Q 10-Q at Ex. 32.1.

45. The foregoing statements made in the 1Q 10-Q certifications referenced above in ¶44 were materially false and misleading for the same reasons stated in ¶¶40, 41.

**The Truth Emerges**

46. On August 3, 2017, after the close of the market, the Company issued a press release (the "August 3 Press Release") announcing the delay in releasing its second quarter 2017

preliminary results due to an internal investigation regarding its accounting practices, stating in part:

> EFI Announces Postponement of Conference Call
>
> August 03, 2017 16:25 ET | Source: Electronics For Imaging, Inc.
>
> FREMONT, Calif., Aug. 03, 2017 (GLOBE NEWSWIRE) -- Electronics For Imaging, Inc. (Nasdaq:EFII), a world leader in customer-focused digital printing innovation, is postponing the conference call at which it anticipated discussing second quarter 2017 preliminary results in order to enable the Company to complete an assessment of the timing of recognition of revenue. The assessment is related to certain transactions where a customer signed a sales contract for one or more large format printers and was invoiced, and the printer(s) were stored at a third party in-transit warehouse prior to delivery to the end user.
>
> In addition, EFI is in the process of completing an assessment of the effectiveness of EFI's current and historical disclosure controls and internal control over financial reporting. EFI expects to report a material weakness in internal control over financial reporting related to this matter. EFI also expects to report that EFI's disclosure controls were not effective in prior periods.
>
> The Company currently expects that the total aggregate revenue for the periods under review will not be materially different from the aggregate revenue that was previously reported for those periods, taking into account any revenue from the prior periods that may be moved into the current or upcoming periods.
>
> The Audit Committee of EFI's Board of Directors is conducting an independent review related to the matter and has retained independent professionals to assist in that review.
>
> A subsequent press release will be issued announcing a new date and time for the distribution of earnings information for the second quarter of 2017. EFI may be unable to file its Form 10-Q for the second quarter of 2017 on a timely basis.

47. On this news, shares of the Company fell $21.61 per share, or over 45%, from its previous closing price to close at $26.05 per share on August 4, 2017, damaging investors.

48. As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

**DEFENDANTS KNEW OF MATERIAL WEAKNESSES IN INTERNAL CONTROLS THROUGHOUT THE CLASS PERIOD**

49. EFI was required by the SEC but failed to maintain books and records in sufficient detail to reflect the transactions of the Company and prepare financial statements in accordance with generally accepted accounting principles ("GAAP").[3] Section 13(b) 2 of the Exchange Act entitled *Periodical and Other Reports* states the following with respect to books and records and internal controls:

> Every issuer which has a class of securities registered pursuant to section 12 and every issuer which is required to file reports pursuant to section 15(d) shall:
>
> A. Make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the issuer;
>
> B. devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that –
>
> > i. transactions are executed in accordance with management's general or specific authorization;
> > ii. transactions are recorded as necessary (I) to permit preparation of financial statements in conformity with generally accepted accounting principles or any other criteria applicable to such statements, and (II) to maintain accountability for assets;

[3] GAAP are those principles recognized by the accounting profession as the conventions, rules and procedures necessary to define accepted accounting practice at a particular time. Regulation S-X (17 C.F.R. § 210.4-01(a)(1)) states that financial statements filed with the SEC which are not prepared in compliance with GAAP are presumed to be misleading and inaccurate. Regulation S-X requires that interim financial statements must also comply with GAAP, with the exception that interim financial statements need not include disclosure which would be duplicative of disclosures accompanying annual financial statements. 17 C.F.R. § 210.10-01(a).

iii. access to assets is permitted only in accordance with management's general or specific authorization; and

iv. the recorded accountability for assets is compared with the existing assets at reasonable intervals and appropriate action is taken with respect to any differences.

50. A good system of internal controls helps management achieve its objectives related to the effectiveness and efficiency of its operations, the reliability of its financial reporting, and compliance with applicable laws and regulations. It is management's responsibility to develop and implement internal controls necessary to ensure that it maintains adequate books and records. This is made clear in SEC regulations and in a report prepared by the Committee of Sponsoring Organizations of the Treadway Commission ("COSO"), Internal Control – Integrated Framework (the "COSO Report").

51. The COSO Report defines internal control as a process that is "designed to provide reasonable assurance regarding the achievement of objectives" related to the effectiveness and efficiency of operations, the reliability of financial reporting, and compliance with applicable laws and regulations. More broadly, however, a system of internal control encompasses more than the policies governing the objectives related to operations, financial reporting, and compliance; namely, it includes the actions taken by a company's board of directors, management at all levels, and employees in running the business.

52. The COSO Report requires that financial statements prepared for external purposes be fairly presented in conformity with GAAP and regulatory requirements. Borrowing from generally accepted auditing standards, the COSO Report defines fair presentation as the following:

- the accounting principles selected and applied have general acceptance;
- the accounting principles are appropriate in the circumstances;

- the financial statements are informative of matters that may affect their use, understanding and interpretation; and

- the financial statements reflect the underlying transactions and events in a manner that presents the financial position, results of operations and cash flows stated within a range of acceptable limits, that is, limits that are reasonable and practical to attain in financial statements.

53. The COSO Report describes internal control within a certain framework that consists of five separate components. It requires that financial statements prepared for external use are fairly presented in conformity with generally accepted accounting principles and regulatory requirements. The COSO Report defines five components of an internal control framework that are needed to enable a business to achieve its objectives: (1) the control environment, (2) risk assessment, (3) control activities, (4) information and communications and (5) monitoring.

54. Everyone in an organization has responsibility for internal control. The CEO, however, sets the "tone at the top" that affects integrity, ethics, and other factors of a positive control environment. "In any organization, 'the buck stops' with the chief executive. He or she has ultimate ownership responsibility for the internal control system. The influence of the CEO on an entire organization cannot be overstated."[4] The chief executive fulfills this duty by providing leadership and direction to senior managers and reviewing the way they are controlling the business. The Addendum to the COSO Report makes it clear that the Chief Financial Officer, who in the case of EFI was Defendant Olin, plays a critical role with respect to the internal control system.

55. Specifically, the CEO, Defendant Gecht and the CFO, Defendant Olin failed to comply with SEC regulations and the requirements of COSO. As described herein there were

[4] COSO Report, Chapter 8, p. 84.

material weaknesses in internal control at EFI that were necessary to prepare accurate financial statements and unsure compliance with regulatory filing requirements applicable to public companies.[5] A material weakness is defined by the SEC as "a deficiency, or a combination of deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of the registrant's annual or interim financial statements will not be prevented or detected on a timely basis."[6] EFI's internal control system failed to live up to the standards as set forth in the five elements of an internal control framework described above. Defendants Gecht and Olin failed to maintain a proper tone and control awareness that focused on achieving consistent application of accounting policies and procedures and strict adherence to GAAP.

56. In its prior public filings Defendants Gecht and Olin had concluded that disclosure controls and procedures were effective as of December 31, 2016.[7] Moreover, in its 1Q 10-Q for the period ended March 31, 2017, in addition to determining that that disclosure controls and procedures were effective as of December 31, 2016, Gecht and Olin stated that there was no change in internal controls over financial reporting that has materially affected or is reasonably likely to materially affect the internal controls over financial reporting.[8] These representations when made

---

[5] 2016 10-K, Item 9A.

[6] The Public Company Accounting Oversight Board's ("PCAOB") definition is identical, except is replaces the word "registrant's" with "company's" and notes that "There is a reasonable possibility of an event, as used in this standard, when the likelihood of the event is either 'reasonably possible' or 'probable,' as those terms are used in Financial Accounting Standards Board Statement No. 5, Accounting for Contingencies ('FAS 5')." AS 5 ¶A7.

[7] EFI Form 10-K for the period ended December 31, 2016, filed February 22, 2017, Item 9A.

[8] EFI Quarterly Report on Form 10-Q for the period ended March 31, 2017, filed May 2, 2017, Item 4.

were false given the disclosure made on August 3, 2017 and the subsequent revisions to the 2016 10-K and the 1Q 10-Q for the period ended March 31, 2017.

57. In connection with EFI's filing of the 2016 10-K and the 1Q 10-Q, Gecht and Olin provided certifications that were false.

58. As of November 27, 2017, EFI still had much work to do in order to have a proper internal control process. EFI disclosed remediation efforts which were underway, including among others:

- design and implement controls to properly identify, evaluate and monitor operational changes which may impact revenue recognition;
- evaluate the sufficiency, experience, and training of our internal personnel and hire additional personnel or use external resources;
- design and implement controls related to the approval and accounting for any bill and hold transactions; design and implement controls to evaluate excess and obsolete inventory reserves at our Italian subsidiary; and
- direct our internal auditors to perform additional testing of revenue transactions to ensure the sufficiency of our remediation efforts.

59. As a result of the material internal control weaknesses described above, EFI failed to comply with SEC regulation and the requirements of COSO. EFI had a poor tone at the top, they were unable to perform the necessary levels of monitoring and oversight and were unable to resolve complex accounting issues. This was all the more important given that EFI had an insufficient number of personnel with the appropriate levels of experience.

60. Thus, Defendants knew that these material internal control weaknesses existed throughout the Class Period.

**ADDITIONAL SCIENTER ALLEGATIONS**

61. In the 2016 10-K, Deloitte & Touche LLP ("Deloitte"), EFI's independent auditor, stated: "In our opinion, the Company maintained, in all material respects, effective internal control over financial reporting as of December 31, 2016, based on the criteria established in *Internal Control—Integrated Framework (2013)* issued by the Committee of Sponsoring Organizations of the Treadway Commission." 2016 10-K, Item 9A.

62. In Amendment No. 1 to the 2016 10-K, filed with the SEC on September 11, 2017, however, Deloitte stated the following: "In our report dated February 21, 2017, we expressed an unqualified opinion on the effectiveness of the Company's internal control over financial reporting. As described in the following paragraphs, the Company subsequently identified material weaknesses in its internal control over financial reporting. Accordingly, management has revised its assessment of the effectiveness of its internal control over financial reporting, and our present opinion on the effectiveness of the Company's internal control over financial reporting as of December 31, 2016, as expressed herein, is different than that expressed in our previous report."

63. Deloitte also stated: "A material weakness is a deficiency, or a combination of deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of the company's annual or interim financial statements will not be prevented or detected on a timely basis. The following material weaknesses have been identified and included in management's assessment. Specifically, the Company's internal controls were not designed effectively to ensure that operational changes which may impact revenue recognition were appropriately and timely evaluated to determine the accounting impact; and the Company did not sufficiently staff, with appropriate levels of experience and training, to allow for the adequate monitoring and timely communication of operational changes, including those which

may impact revenue recognition on an ongoing basis. This resulted in Management not timely identifying and evaluating the appropriate period of recognition for certain revenue transactions related to printers distributed from a single location, which should have been evaluated in accordance with the bill and hold revenue recognition guidance. While there was no restatement of previously issued financial statements, management reevaluated the design and operating effectiveness of the Company's internal control over financial reporting. Management concluded that its internal control over financial reporting as of December 31, 2016, was not effective due to the material weaknesses described above. These material weaknesses were considered in determining the nature, timing, and extent of audit tests applied in our audit of the consolidated financial statements and financial statement schedule as of and for the year ended December 31, 2016, of the Company and this report does not affect our report on such financial statements and financial statement schedule."

64. Deloitte then concluded: "In our opinion, because of the effect of the material weaknesses identified above on the achievement of the objectives of the control criteria, the Company has not maintained effective internal control over financial reporting as of December 31, 2016, based on the criteria established in Internal Control — Integrated Framework (2013) issued by the Committee of Sponsoring Organizations of the Treadway Commission."

65. In Amendment No. 2 to the 2016 10-K, filed with the SEC on November 27, 2017, Deloitte stated the following: "In our report dated February 21, 2017, we expressed an unqualified opinion on the effectiveness of the Company's internal control over financial reporting. As described in the following paragraphs, the Company subsequently identified material weaknesses in its internal control over financial reporting. Accordingly, management has revised its assessment of the effectiveness of its internal control over financial reporting, and our present

opinion on the effectiveness of the Company's internal control over financial reporting as of December 31, 2016, as expressed herein, is different than that expressed in our original report."

66. Deloitte also stated: "A material weakness is a deficiency, or a combination of deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of the company's annual or interim financial statements will not be prevented or detected on a timely basis. The following material weaknesses have been identified and included in management's assessment: (1) the Company's internal controls were not designed effectively to ensure that operational changes which may impact revenue recognition were appropriately and timely evaluated to determine the accounting impact; (2) the Company did not sufficiently staff, with appropriate levels of experience and training, to allow for the adequate monitoring and timely communication of operational changes, including those which may impact revenue recognition on an ongoing basis; (3) the Company's control over excess and obsolete, finished goods inventory printer reserves at its Italian manufacturing subsidiary was not designed effectively to conduct an evaluation of the classification, condition and salability of each printer and the cost accounting department was not staffed sufficiently to mitigate limitations relating to these reserves in the ERP system used solely at this subsidiary."

67. Deloitte continued: "Items #1 and #2 resulted in management not timely identifying and evaluating the appropriate period of recognition for certain revenue transactions related to printers distributed from a single location, which should have been evaluated in accordance with the bill and hold revenue recognition guidance. Item #3 resulted in management not timely evaluating the appropriate period of de-recognition of certain printer inventory manufactured at their Italian manufacturing subsidiary, which should have been subject to an excess and obsolescence impairment or reclassification and depreciation. These material weaknesses were

considered in determining the nature, timing, and extent of audit tests applied in our audit of the consolidated financial statements and financial statement schedule as of and for the year ended December 31, 2016, of the Company and this report does not affect our report on such financial statements and financial statement schedule."

68. Deloitte concluded: "In our opinion, because of the effect of the material weaknesses identified above on the achievement of the objectives of the control criteria, the Company has not maintained effective internal control over financial reporting as of December 31, 2016, based on the criteria established in Internal Control — Integrated Framework (2013) issued by the Committee of Sponsoring Organizations of the Treadway Commission."

69. Deloitte did not disclose, in either Amendment No. 1 or Amendment No. 2 to the 2016 10-K, that it had received any information that was in any way new, different, or changed when compared to the information in its possession at the time the original 2016 10-K was filed, indicating that Defendants furnished false or misleading information to Deloitte in connection with the audit.

## PLAINTIFFS' CLASS ACTION ALLEGATIONS

70. Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired EFI securities publically traded on NASDAQ during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosures. Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

71. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, EFI securities were actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiffs at this time and can be ascertained only through appropriate discovery, Plaintiffs believe that there are at least hundreds or thousands of members in the proposed Class. Millions of EFI shares were traded publicly during the Class Period on the NASDAQ. As of January 26, 2017, EFI had 46,431,857 shares of common stock outstanding. Record owners and other members of the Class may be identified from records maintained by EFI or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

72. Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

73. Plaintiffs will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

74. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

a. whether the federal securities laws were violated by Defendants' acts as alleged herein;

b. whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of the Company;

c. whether the Individual Defendants caused the Company to issue false and misleading financial statements during the Class Period;

d. whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

e. whether the prices of EFI securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

f. whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

75. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

**APPLICABLITY OF THE PRESUMPTION OF RELIANCE (FRAUD-ON-THE-MARKET DOCTRINE)**

76. Plaintiffs will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

a. Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

b. the omissions and misrepresentations were material;

c. EFI securities are traded in an efficient market;

d. the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

e. the Company traded on the NASDAQ and was covered by multiple analysts;

f. the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

g. Plaintiffs and members of the Class purchased, acquired and/or sold U.S. EFI securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

77. Based upon the foregoing, Plaintiffs and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

78. The market for EFI's securities was open, well-developed and efficient at all relevant times. As a result of the materially false and/or misleading statements and/or failures to disclose, EFI's securities traded at artificially inflated prices during the Class Period. On April 20, 2017, the Company's stock price closed at a Class Period adjusted high of $50.85 per share. Plaintiffs and other members of the Class purchased or otherwise acquired the Company's

securities relying upon the integrity of the market price of EFI's securities and market information relating to EFI, and have been damaged thereby.

79. During the Class Period, the artificial inflation of EFI's stock was caused by the material misrepresentations and/or omissions particularized in this Complaint causing the damages sustained by Plaintiffs and other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about EFI's business, prospects, and operations. These material misstatements and/or omissions created an unrealistically positive assessment of EFI and its business, operations, and prospects, thus causing the price of the Company's securities to be artificially inflated at all relevant times, and when disclosed, negatively affected the value of the Company stock. Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiffs and other members of the Class purchasing the Company's securities at such artificially inflated prices, and each of them has been damaged as a result.

80. At all relevant times, the market for EFI's securities was an efficient market for the following reasons, among others:

a. EFI stock met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

b. As a regulated issuer, EFI filed periodic public reports with the SEC and/or the NASDAQ; EFI regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and/or

c. EFI was followed by securities analysts employed by brokerage firms who wrote reports about the Company, and these reports were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

81. As a result of the foregoing, the market for EFI's securities promptly digested current information regarding EFI from all publicly available sources and reflected such information in EFI's stock price. Under these circumstances, all purchasers of EFI's securities during the Class Period suffered similar injury through their purchase of EFI's securities at artificially inflated prices and a presumption of reliance applies.

82. A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class's claims are, in large part, grounded on Defendants' material misstatements and/or omissions. Because this action involves Defendants' failure to disclose material adverse information regarding the Company's business operations and financial prospects—information that Defendants were obligated to disclose—positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions. Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

**NO SAFE HARBOR**

83. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and

conditions. In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of EFI who knew that the statement was false when made.

## COUNT I

### Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Against All Defendants

84. Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

85. This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

86. During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiffs and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities. Such scheme was intended to, and, throughout

the Class Period, did: (i) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of EFI securities; and (iii) cause Plaintiffs and other members of the Class to purchase or otherwise acquire EFI securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

87. Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for EFI securities. Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company's finances and business prospects.

88. By virtue of their positions at the Company, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiffs and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants. Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth. In addition, each defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

89. Defendants were personally motivated to make false statements and omit material information necessary to make the statements not misleading in order to personally benefit from the sale of EFI securities from their personal portfolios.

90. The Company showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control. As the senior managers and/or directors of the Company, the Individual Defendants had knowledge of the details of the Company's internal affairs.

91. The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of the Company. As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to the Company's businesses, operations, future financial condition and future prospects. As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of EFI securities was artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning the Company's business and financial condition which were concealed by Defendants, Plaintiffs and the other members of the Class purchased or otherwise acquired EFI securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by Defendants, and were damaged thereby.

92. During the Class Period, EFI securities were traded on an active and efficient market. Plaintiffs and the other members of the Class, relying on the materially false and misleading statements described herein, which the Defendants made, issued or caused to be

disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of EFI securities at prices artificially inflated by Defendants' wrongful conduct. Had Plaintiffs and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid. At the time of the purchases and/or acquisitions by Plaintiffs and the Class, the true value of EFI securities was substantially lower than the prices paid by Plaintiffs and the other members of the Class. The market price of EFI securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

93. By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

94. As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's securities during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

## COUNT II

### Violations of Section 20(a) of the Exchange Act Against the Individual Defendants

95. Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

96. During the Class Period, the Individual Defendants participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of the Company's business affairs. Because of their senior positions, they knew the

adverse non-public information about the Company's current financial position and future business prospects.

97. As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to U.S. the Company's business practices, and to correct promptly any public statements issued by the Company which had become materially false or misleading.

98. Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which the Company disseminated in the marketplace during the Class Period concerning the Company's business, operational and accounting policies. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause the Company to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of the Company within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of EFI securities.

99. Each of the Individual Defendants, therefore, acted as a controlling person of the Company. By reason of their senior management positions and/or being directors of the Company, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, the Company to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised control over the general operations of the Company and possessed the power to control the specific activities which comprise the primary violations about which Plaintiffs and the other members of the Class complain.

100. Specifically, each of the Individual Defendants is a culpable participant because he was in direct communication with the SEC about the improper accounting treatment of the redeemable non-controlling interests of the Company's partnerships and therefore knew or recklessly disregarded that the Company's accounting for redeemable non-controlling interests of its partnerships was materially false. Notwithstanding their knowledge of the Company's improper accounting and the effect on their personal bonuses and share compensation, Defendants Gecht and Olin knowingly or recklessly certified the Company's materially false and misleading financial results.

101. By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by the Company.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand judgment against Defendants as follows:

A. Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiffs as the Class representatives;

B. Requiring Defendants to pay damages sustained by Plaintiffs and the Class by reason of the acts and transactions alleged herein;

C. Awarding Plaintiffs and the other members of the Class prejudgment and post-judgment interest, as well as her reasonable attorneys' fees, expert fees and other costs; and

D. Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiffs hereby demand a trial by jury.

Dated: February 20, 2018

Respectfully submitted,

**THE ROSEN LAW FIRM, P.A.**

By: /s/ *Laurence Rosen*
Laurence M. Rosen, Esq.
609 W. South Orange Avenue, Suite 2P
South Orange, NJ 07079
Tel: (973) 313-1887
Fax: (973) 833-0399
Email: lrosen@rosenlegal.com

Jacob Goldberg
Keith R. Lorenze, Esq.
101 Greenwood Avenue, Suite 440
Jenkintown, PA 19046
Tel: (215) 600-2817
Fax: (212) 202-3827
Email: jgoldberg@rosenlegal.com
Email: klorenze@rosenlegal.com

***Co-Lead Counsel for Lead Plaintiffs & the Class***

**GLANCY PRONGAY & MURRAY LLP**

Lionel Z. Glancy
Robert V. Prongay
Lesley F. Portnoy
1925 Century Park East, Suite 2100
Los Angeles, CA 90067
Tel: (310) 201-9150
Fax: (310) 201-9160
Email: rprongay@glancylaw.com

***Co-Lead Counsel for Lead Plaintiffs & the Class***

**CARELLA, BYRNE, CECCHI, OLSTEIN, BRODY & AGNELLO, P.C.**

James E. Cecchi
Lindsey H. Taylor
Donald A. Ecklund
5 Becker Farm Road
Roseland, NJ 07068
Tel: (973) 994-1700

***Liaison Counsel for the Class***

## CERTIFICATE OF SERVICE

I hereby certify that on this 20th day of February, 2018, a true and correct copy of the foregoing ***Amended Class Action Complaint for Violation of the Federal Securities Laws*** was served by CM/ECF to the parties registered to the Court's CM/ECF system.

/s/ *Keith Lorenze*
Keith Lorenze
The Rosen Law Firm, P.A.
101 Greenwood Avenue, Suite 440
Jenkintown, PA 19046
Tel: 215-600-2817
klorenze@rosenlegal.com