<u>NOT FOR PUBLICATION</u>

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

<table>
<tr><td>In Re: ELECTRONICS FOR IMAGING, INC. SECURITIES LITIGATION</td><td>Civil Action No. 17-5992<br><br>OPINION</td></tr>
</table>

**ARLEO, United States District Judge**

      **THIS MATTER** comes before the Court by way of Defendants Electronics For Imaging, Inc. ("EFI" or the "Company"), Guy Gecht ("Gecht"), and Mark Olin's ("Olin," or, when referenced together with EFI and Gecht, "Defendants") Motion to Dismiss, ECF No. 28, Plaintiffs' Amended Class Action Complaint. ECF No. 27. Lead Plaintiffs Donald B. Cork and Anthony Pipitone ("Plaintiffs") oppose the Motion. ECF No. 29.

      Plaintiffs bring securities fraud claims that are predicated upon alleged misrepresentations contained in EFI's annual and quarterly financial reports. For the reasons set forth herein, Plaintiffs' Amended Complaint fails to adequately plead that Defendants acted with scienter. The Court will accordingly **GRANT** Defendants' Motion and **DISMISS** Plaintiffs' Amended Complaint without prejudice.

**I.**      **FACTS[1]**

      **A. Background and Procedural History**

      Plaintiffs bring this putative class action on behalf of all persons and entities that came into possession of publicly-traded EFI securities from February 22, 2017 to August 3, 2017 (the "Class Period"). Am. Compl. ¶ 5. Defendant EFI is a publicly-traded company that provides

---

[1] The facts set forth herein are derived exclusively from Plaintiffs' Amended Complaint. The parties did not submit any exhibits for the Court's consideration.

goods and services within the printing industry.  Id. at ¶¶ 1, 21-22.  Defendants Guy Gecht and

Marc Olin served as the Company's Chief Executive Officer ("CEO") and Chief Financial

Officer ("CFO"), respectively, throughout the Class Period.  Id. at ¶¶ 13-14.

Plaintiffs allege that Defendants intentionally or recklessly misrepresented the adequacy

of EFI's internal controls in the Company's annual and quarterly financial reports.  See id. at ¶¶

2-5.  Plaintiffs allege that statements in EFI's 2016 Form 10-K and First Quarter 2017 Form 10-

Q falsely assured investors that the Company's internal controls and procedures were functional

and effective.  See id. at ¶¶ 30-33, 38-41.  Defendants subsequently filed Amendments to the

Forms 10-K and 10-Q, in which the Company enumerated three deficiencies in its internal

controls.  See id. at ¶¶ 3, 32-33, 40-41.  The Amendments specified that the internal controls had

not been effective during the time periods covered by the forms.  Id. at ¶¶ 33, 41.  Based on the

admissions in the Amendments, Plaintiffs allege that Defendants intentionally or recklessly

misrepresented the adequacy of the internal controls in the original reports.  See id. at ¶¶ 32-33,

40-41.

On August 3, 2017—after filing the relevant Forms 10-K and 10-Q, but before filing the

Amendments—EFI issued a press release to announce that its second quarter financial results

would be delayed due to an internal investigation into the effectiveness of its internal controls.

Id. at ¶¶ 1, 46.  The press release disclosed that the Company expected to report a material

weakness in its internal controls.  Id.  The next day, the Company's stock fell "over 45% from its

previous closing price."  Id. at ¶¶ 1, 47.

Approximately one week later, on August 10, 2017, Plaintiffs filed a Complaint alleging

that Defendants had violated federal securities laws.  ECF No. 1.  On February 20, 2018, after

Defendants amended the Forms 10-K and 10Q, Plaintiffs filed an Amended Complaint adding

allegations that relate to the admissions reported in the Amendments.  ECF No. 27.  Defendants subsequently filed the instant Motion to Dismiss for failure to state a claim pursuant to Federal Rules of Civil Procedure 9(b) and 12(b)(6) and the Private Securities Litigation Reform Act ("PSLRA").

### B. Alleged Evidence of Misrepresentations

#### 1. 2016 Form 10-K

The Class Period commenced on February 22, 2017 when EFI filed its annual Form 10-K in which it reported its financial results for the 2016 fiscal year.  Id. at ¶ 30.  The 10-K stated that EFI's CEO and CFO (Defendants Gecht and Olin) had evaluated the Company's internal controls and concluded that the "disclosure controls and procedures were effective to provide reasonable assurance as of December 31, 2016." Id. ¶ 31.  The 10-K further stated that, based on a review that considered criteria set forth by the Committee of Sponsoring Organizations of the Treadway Commission ("COSO")[2], the Company "concluded that [its] internal control over financial reporting was effective as of December 31, 2016." Id.

Defendants appended Certifications to the 10-K pursuant to Sections 302 and 906 of the Sarbanes-Oxley Act (the "SOX Certifications").  Id. at ¶¶ 34, 36.  The Certifications were executed by Defendants Gecht and Olin in their professional capacities.  Id.

The Section 302 Certification affirmed that Gecht and Olin reviewed the 10-K and believed that its contents provided a fair and accurate representation of the Company's financial condition.  Id. at 34.  The Certification further acknowledged Gecht and Olin's obligation to

---

[2] COSO is a joint initiative of private-sector organizations that works to reduce fraud through the issuance of comprehensive frameworks and guidance.  See About Us, COMMITTEE OF SPONSORING ORGANIZATIONS OF THE TREADWAY COMMISSION, https://www.coso.org/Pages/aboutus.aspx (last visited Jan. 29, 2019).

"establish[] and maintain[] disclosure controls and procedures . . . and internal control over financial reporting." Id. The officers certified that the Company had designed such internal controls that would: (1) "ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to [the certifying officers] by others within those entities"; and (2) "provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purpose in accordance with generally accepted accounting principles." Id. The Certification represented that the signatories had "[e]valuated the effectiveness" of the internal controls, reported "[their] conclusions about the effectiveness of the disclosure controls and procedures," and disclosed "any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter . . . that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting." Id. Finally, the officers certified that they had disclosed to EFI's auditors all known "significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting," and "[a]ny fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting." Id.

Similarly, in the Section 906 Certification, Gecht and Olin affirmed that the 10-K was in full compliance with relevant sections of the Securities Exchange Act and that "the information contained in the [10-K] fairly presents, in all material respects, the financial condition and results of operations of the Company." Id. at ¶ 36.

### 2. First Quarter 2017 Form 10-Q (the "1Q 10-Q")

On May 2, 2017, the Company filed its Form 10-Q in which it reported its financial results for the first fiscal quarter of 2017. Id. at ¶ 38. Defendants reported that the CEO and

CFO (Defendants Gecht and Olin) were involved in "an evaluation of the effectiveness of the design and operation of [the Company's] disclosure controls and procedures," upon which they "concluded that [their] disclosure controls and procedures were effective as of March 31, 2017." Id. at ¶ 39. Plaintiffs allege that Defendants appended certifications to the 10-Q that were substantially similar to the SOX Certifications appended to the 10-K. Id. at ¶¶ 42-45.

### 3. The August 3, 2017 Press Release

On August 3, 2017, EFI issued a press release to announce that disclosure of its 2017 second quarter preliminary results would be delayed due to an internal investigation into its accounting practices. Id. at ¶ 46. The press release noted that EFI expected to report the existence of "a material weakness in internal control over financial reporting" and "that EFI's disclosure controls were not effective in prior periods." Id. at ¶ 46. The press release also indicated the Company's expectation that "the total aggregate revenue for the periods under review [would] not be materially different from the aggregate revenue that was previously reported for those periods." Id. at ¶ 46. The next day, the Company's stock fell by $21.61 per share, which amounted to a drop of approximately forty-five percent. Id. at ¶ 47.

### 4. The Amendments

On September 11, 2017, Defendants held a conference call to discuss the Company's 2017 second quarter results. Id. at ¶ 27. Defendants represented that they had conducted a "very thorough review" involving "many people across [their] legal, operations and finance teams, together with [their] outside counsel and external professional consultants." Id. Defendants noted that the review led to a "very difficult time for [their] entire organization." Id.

EFI filed Amendments to the Forms 10-K and 10-Q on September 11, 2017—the date of the aforementioned conference call—and on November 27, 2017. Id. at ¶¶ 32-33, 40-41. The

Amendments collectively revealed that as of December 31, 2016, EFI's "disclosure controls and procedures were not effective" based on the existence of certain "material weaknesses[3] in internal control over financial reporting." Id. The Amendments identified the following three internal control deficiencies: (1) the "internal controls were not designed effectively to ensure that operational changes, which may impact revenue recognition, were appropriately and timely evaluated to determine the accounting impact," id.; (2) the Company "did not sufficiently staff, with appropriate levels of experience and training, to allow for the adequate monitoring and timely communication of operational changes, including those which may impact revenue recognition on an on-going basis," id.; and (3) the Company's "internal control over excess and obsolete, finished goods printer inventory reserves at [its] Italian manufacturing subsidiary was not designed effectively to conduct a sufficiently precise evaluation of the classification, condition, and salability of each printer" and the "accounting department was not staffed sufficiently to mitigate limitations relating to these reserves in the ERP[4] system used solely at this subsidiary," id. at ¶¶ 33, 41; see id. at ¶¶ 32, 40. The Amendments reported the impact of the identified deficiencies as follows:

> Items #1 and #2 resulted in management not timely identifying and evaluating the appropriate period of recognition for certain revenue transactions related to printers distributed from a single location, which should have been evaluated in accordance with the bill and hold revenue recognition guidance. Item #3 resulted in management

---

[3] In Amendment Number One, filed on September 11, 2017, Defendants defined a "material weakness" as "a deficiency, or combination of deficiencies, in internal control over financial reporting such that there is a reasonable possibility that a material misstatement of our annual or interim financial statements will not be prevented or detected in [sic] a timely basis." Id. at ¶¶ 32, 40. The Amendment went on to explain that the identified deficiencies represent a material weakness in the Company's internal control over financial reporting because they "could result in a misstatement of revenue and disclosures that could be material to the annual or interim consolidated financial statements." Id.

[4] The Court presumes this to be a reference to "enterprise resource planning" software.

not timely evaluating the appropriate period of de-recognition of certain printer inventory manufactured at our Italian manufacturing subsidiary, which should have been subject to an excess and obsolescence impairment or reclassification and depreciation.

Id. at ¶¶ 33, 41.

The Amendments also reported that EFI implemented a remediation plan after it discovered the internal control deficiencies. Id. at ¶¶ 32-33, 40-41. According to the Amendments, the Company implemented a remediation plan through which they would: "design and implement controls to properly identify, evaluate and monitor operational changes which may impact revenue recognition," "evaluate the sufficiency, experience, and training of [their] internal personnel and hire additional personnel or use external resources," "design and implement controls related to the approval and accounting for any bill and hold transactions," "design and implement controls to evaluate excess and obsolete inventory reserves at [the Company's] Italian subsidiary," and "direct [the Company's] internal auditors to perform additional testing of revenue transactions to ensure the sufficiency of [their] remediation efforts." Id.

### 5. The October 26, 2017 Press Release

On October 26, 2017, EFI issued another press release in which it disclosed its financial results for the third quarter. Id. at ¶ 28. According to the Amended Complaint, the Company reported the following figures:

GAAP net income of $1.9 million, down 89% compared to $17.7 million for the same period in 2016 or $0.04 per diluted share, down 89% compared to $0.37 per diluted share for the same period in 2016; non-GAAP net income of $22.7 million, down 18% compared to non-GAAP net income of $27.6 million for the same period in 2016 or $0.48 per diluted share, down 17% compared to $0.58 per diluted share for the same period in 2016; and cash flow from operating activities of $3.4 million, down 86% compared to $24.0 million during the same period in 2016."

7

Id.  Through the press release, CEO Gecht stated that EFI was "clearly disappointed in the third quarter results, which fell below [their] expectations largely due to delayed deals in [their] direct business."  Id.  During a conference call on the same day, Gecht told analysts that "a large number of inkjet and software deals" that the Company expected to close late in the quarter ultimately did not close.  Id. at ¶ 29.  Gecht explained that "internal distraction" caused by the review of the Company's internal controls prevented many anticipated deals from closing by the end of the quarter.  Id.  He indicated that the quarter represented the Company's "worst conversion rate of any quarter in recent memory."  Id.

## C.  Additional Allegations in Support of Scienter

### 1.  GAAP Violations

Plaintiffs allege that Defendants' record-keeping practices violated the generally accepted accounting principles ("GAAP").[5]  See id. at ¶¶ 49-60.  Plaintiffs further allege that these GAAP violations support the conclusion that Defendants knew about the internal control deficiencies during the Class Period.  See id. at ¶¶ 54-60.

The Amended Complaint alleges that "[t]he CEO . . . sets the 'tone at the top' that affects integrity, ethics, and other factors of a positive control environment" and that "'[h]e or she has ultimate ownership responsibility for the internal control system.'"  Id. at ¶ 54.  Plaintiffs allege that Defendants Gecht and Olin, in their capacities as EFI's CEO and CFO, "failed to comply with SEC regulations and the requirements of COSO" as evidenced by "material weaknesses in internal control at EFI that were necessary to prepare accurate financial statements and unsure

---

[5] Plaintiffs' Complaint defines "GAAP" as "those principles recognized by the accounting profession as the conventions, rules and procedures necessary to define accepted accounting practices at a particular time."  Id. at ¶ 49 n.1.

[sic] compliance with regulatory filing requirements applicable to public companies." Id. at ¶ 55. Plaintiffs allege that "Defendants Gecht and Olin failed to maintain a proper tone and control awareness that focused on achieving consistent application of accounting policies and procedures and strict adherence to GAAP." Id. Plaintiffs allege that Defendants' assurances about the adequacy of EFI's internal controls in the 10-K and 10-Q were false when made in light of the disclosures reported in the August 3 press release and the Amendments to the 10-K and 10-Q. Id. at ¶ 56. The Amended Complaint further alleges that "EFI had a poor tone at the top, they were unable to perform the necessary levels of monitoring and oversight and were unable to resolve complex accounting issues." Id. at ¶ 59. Plaintiffs allege that "[t]his was all the more important given that EFI had an insufficient number of personnel with the appropriate levels of experience." Id. Based on the foregoing, Plaintiffs allege that Defendants knew about the internal control deficiencies during the Class Period. Id. at ¶ 60.

### 2. Deloitte Audit

In the 2016 10-K, EFI's independent auditor, Deloitte & Touche, LLP ("Deloitte") expressed an unqualified opinion that EFI "maintained, in all material respects, effective internal control over financial reporting as of December 31, 2016, based on the criteria established" by COSO. Id. at ¶ 61. In the Amendments to the 10-K filed on September 11, 2017 and November 27, 2017, Deloitte reported that it had revised its opinion upon learning of the material weaknesses in the Company's internal controls described above. See id. at ¶¶ 62, 65. Deloitte outlined the material weaknesses and issued the following revised opinion:

> In our opinion, because of the effect of the material weaknesses identified above on the achievement of the objectives of the control criteria, the Company has not maintained effective internal control over financial reporting as of December 31, 2016, based on the criteria established in Internal Control – Integrated Framework

> (2013) issued by the Committee of Sponsoring Organizations of the
> Treadway Commission.

Id. at ¶¶ 63-64, 66-68. The Complaint alleges that "Deloitte did not disclose" in either

Amendment "that it had received any information that was in any way new, different, or changed

when compared to the information in its possession at the time the original 2016 10-K was

filed," which, Plaintiffs allege, "indicat[es] that Defendants furnished false or misleading

information to Deloitte in connection with the audit." Id. at ¶ 69.

## II.    LEGAL STANDARDS

### A.   Standards for Rule 12(b)(6) Motion to Dismiss

Under Federal Rule of Civil Procedure 8, a pleading is sufficient so long as it includes "a

short and plain statement of the claim showing that the pleader is entitled to relief" and provides

the defendant with "fair notice of what the . . . claim is and the grounds upon which it rests."

Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007) (internal quotation marks omitted). In

considering a Rule 12(b)(6) motion to dismiss, the court accepts all of the facts in the complaint

as true and draws all reasonable inferences in favor of the plaintiff. Phillips v. County of

Allegheny, 515 F.3d 224, 231 (3d Cir. 2008). Dismissal is inappropriate even where "it appears

unlikely that the plaintiff can prove those facts or will ultimately prevail on the merits." Id.

However, the facts alleged must be "more than labels and conclusions, and a formulaic

recitation of the elements of a cause of action will not do." Twombly, 550 U.S. at 555. The

allegations in the complaint "must be enough to raise a right to relief above the speculative

level." Id. Accordingly, a complaint will survive a motion to dismiss if it provides a sufficient

factual basis such that it states a facially plausible claim for relief. See Ashcroft v. Iqbal, 556

U.S. 662, 678 (2009).

### B.   Standard for Securities Fraud

In addition to the customary pleading requirements under Rule 8, plaintiffs alleging securities fraud must meet the heightened pleading requirements set forth by Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act ("PSLRA"). See City of Edinburgh Council v. Pfizer, Inc., 754 F.3d 159, 166 (3d Cir. 2014); In re Alpharma, Inc. Sec. Litig., 372 F.3d 137, 148 (3d Cir. 2004). To allege fraud under Rule 9(b), "a party must state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b). At a minimum, "plaintiffs [must] support their allegations of securities fraud with all of the essential factual background that would accompany the first paragraph of a newspaper story—that is, the who, what, when, where and how of the events at issue." In re Alpharma, 372 F.3d at 148 (internal quotation marks omitted).

To allege fraud under the PSLRA, the plaintiff must "state with particularity both the facts constituting the alleged violation, and the facts evidencing scienter, i.e., the defendant's intention 'to deceive, manipulate, or defraud.'" Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 313 (2007) (quoting Ernst & Ernst v. Hochfelder, 425 U.S. 185, 194, 194 n.12 (1976)); see also 15 U.S.C. § 78u-4(b)(1), (2). In order to satisfy this particularity requirement, the plaintiff must plead "facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2)(A). A strong inference exists "only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." Tellabs, 551 U.S. at 324. With these principles in mind, the Court turns to the substance of Plaintiffs' § 10(b) claim.

## III.  ANALYSIS

### A.  Count One – 10(b) Violations

Section 10(b) of the Securities Exchange Act of 1934 prohibits the "use or employ[ment], in connection with the purchase or sale of any security . . . [of] any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe." 15 U.S.C. § 78j(b). SEC Rule 10b-5 makes it unlawful

> (a) To employ any device, scheme, or artifice to defraud,
>
> (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, or
>
> (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5.

To state a claim under § 10(b) and Rule 10b-5, a plaintiff must allege "(1) a material misrepresentation or omission[6], (2) scienter, (3) a connection between the misrepresentation or omission and the purchase of a sale or security, (4) reliance upon the misrepresentation or omission, (5) economic loss, and (6) loss causation." City of Edinburgh Council, 754 F.3d at 167. For the purposes of this Motion, the only contested element of Plaintiffs' 10(b) claim is scienter. See Defs.' Br. at 1-3, 3 n.1 and n.2.

Scienter is defined as the intent "to deceive, manipulate, or defraud." See Tellabs, 551 U.S. at 313 (internal quotation marks omitted). In order to sufficiently allege that a defendant acted with scienter, "each act or omission alleged to violate [Section 10(b)] [must] state with particularity facts giving rise to a strong inference that the defendant acted with the required state

---

[6] "[A] corporation is liable for statements by employees who have apparent authority to make them." Inst. Inv'rs Grp. v. Avaya, Inc., 564 F.3d 242, 251 (3d Cir. 2009) (internal quotation marks omitted).

of mind." 15 U.S.C. § 78u-4(b)(2). To allege a "strong inference of scienter from circumstantial evidence," a plaintiff "must sufficiently plead 'Defendants' knowledge of facts or access to information contradicting their public statements . . . . [i.e., that] Defendants knew or, more importantly, should have known that they were misrepresenting material facts related to the corporation.'" Nat'l Junior Baseball League v. PharmaNet Dev. Grp., Inc., 720 F. Supp. 2d 517, 553 (D.N.J. 2010) (quoting In re Campbell Soup Co. Sec. Litig., 145 F. Supp. 2d 574, 599 (D.N.J. 2001)). The Third Circuit permits a plaintiff to satisfy this requirement by alleging strong circumstantial evidence of either conscious or reckless behavior. See Avaya, 564 F.3d at 267; GSC Partners CDO Fund v. Washington, 368 F.3d 228, 237 (3d Cir. 2004). A plaintiff alleging conscious misbehavior must "stat[e] with particularity facts giving rise to a strong inference of conscious wrongdoing, such as intentional fraud or other deliberate illegal behavior." Hull v. Global Dig. Sols., Inc., Civ. No. 16-5153, 2017 WL 6493148, at *6 (D.N.J. Dec. 19, 2017) (internal quotation marks omitted)). A strong inference of scienter arising from reckless conduct must allege a misstatement "involving not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care." Avaya, 564 F.3d at 268 n.42 (internal quotation marks omitted). A reckless statement "presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it." Id. (internal quotation marks omitted). Claims "essentially grounded on corporate mismanagement" are insufficient to plead recklessness. Id. (internal quotation marks omitted).

In evaluating whether a complaint meets the scienter requirement, a court is required to consider inferences urged by the plaintiff as well as "competing inferences rationally drawn from the facts alleged." Tellabs, 551 U.S. at 314. A "strong" inference is "more than merely plausible

or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." Id. "The inference . . . need not be irrefutable, i.e., of the smoking-gun genre, or even the most plausible of competing inferences." Id. at 324 (internal quotation marks omitted). "Omissions and ambiguities 'count against inferring scienter.'" PharmaNet, 720 F. Supp. 2d at 548 (quoting Tellabs, 551 U.S. at 325). A court must consider the entirety of a complaint in determining "whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets this standard." Tellabs, 551 U.S. at 323; see Avaya, 564 F.3d at 273.

Accordingly, the Court will address each alleged basis for scienter and all reasonable opposing inferences of non-fraudulent intent. The Court will then consider the Complaint as a whole in determining whether Plaintiffs have pled facts to support a strong inference of scienter.

### 1. Evidence of Conscious Misbehavior or Recklessness and GAAP Violations

Defendants submit that Plaintiffs have failed to plead any direct or circumstantial evidence sufficient to support a strong inference of scienter. See Defs.' Br. at 2-3, 10-23. Instead, Defendants argue that "the only plausible inference from the allegations in the Amended Complaint is a non-culpable one." Id. at 9. Defendants maintain that they believed EFI's internal controls to be effective when they filed their financial reports. See id. They further submit that when they discovered evidence of material weakness, "they moved quickly to investigate, inform investors, and implement remedial measures." Id. Accordingly, Defendants argue that Plaintiffs' case amounts to "nothing more than classic alleged fraud by hindsight." Id.

Plaintiffs' theory of liability rests largely on the allegation that "Defendants falsely represented that they were engaged in a 'comprehensive effort to review, evaluate, and improve [the Company's] controls' while stating in the same SEC filings that they have concluded that

the controls were effective." <u>See</u> Pls.' Br. at 6-7 (quoting Am. Compl. at ¶ 2). Plaintiffs argue that the disclosures contained in the Amendments "are in direct contradiction" with Defendants' "previous unambiguous statements" that EFI's management "review[ed], evaluate[d], and improve[d]" the internal controls. <u>Id.</u> at 9. Plaintiffs argue that the inaccurate financial reports and SOX Certifications provided "affirmative[] and intentional[] misrepresent[ations] [about] the Company's internal and disclosure controls in order to prop up the Company's stock price artificially." <u>See id.</u> at 7. Plaintiffs submit that by certifying to the effectiveness of the internal controls, Defendants "conceded that they actually assessed the effectiveness of those controls thoroughly." <u>Id.</u> at 9-10. Based on those representations, Plaintiffs argue that there are two possible scenarios: (1) "If [Defendants] lied about their thorough assessment, they are minimally reckless in certifying those controls as effective"; (2) "If, on the other hand, they actually assessed the effectiveness of the Company's internal controls thoroughly, as they certified, then it defies credulity that they did not uncover what were pervasive deficiencies." <u>Id.</u> at 9-10. Plaintiffs conclude that Defendants "[a]ccordingly . . . either 'knew or, more importantly, should have known that they were misrepresenting material facts related to the corporation.'" <u>Id.</u> at 10 (quoting <u>Monk v. Johnson & Johnson</u>, Civ. No. 10-4841, 2011 WL 6339824, at *8-9 (D.N.J. Dec. 19, 2011)).

As a preliminary matter, the Court rejects Plaintiff's first proffered possibility—that Defendants "lied about their thorough assessment." The Complaint alleges absolutely no corroborative facts—let alone "strong circumstantial evidence"—to support the inference that Defendants lied about the performance or the depth of their review. As such, this allegation amounts to nothing more than pure conjecture. On the facts alleged, the Court finds much stronger the opposing inference that Defendants reviewed the internal controls as they reported.

See also In re Am. Int'l Grp., Inc. 2008 Sec. Litig., 741 F. Supp. 2d 511, 529 (S.D.N.Y. 2010)

("If . . . allegations of securities fraud conflict with the plain language of publicly filed disclosure

documents, the disclosure documents control, and the court need not accept the [plaintiff's]

allegations as true." (internal quotation marks omitted)).

The Court finds Plaintiffs' alternative argument equally unavailing. Plaintiffs essentially

argue that Defendants would have noticed the deficiencies if they had reviewed the internal

controls because the material weaknesses were "pervasive." However, the Third Circuit has

repeatedly noted "the difficulty of establishing a 'they-must-have-known' type of inference."

Fain v. USA Techs., Inc., 707 F. App'x 91, 96 (3d Cir. 2017) (declining to find scienter where

plaintiffs relied on defendants' "position[s] at the company, the obvious nature of the error, and

the subsequent actions to remediate"). In order to plead recklessness on the basis of an internal

control deficiency's magnitude, a "[p]laintiff's facts must add up to a 'cogent' inference that the

danger of misleading investors was either actually 'known' by Defendants or 'so obvious that

[they] must have been aware of it.'" Id. (quoting In re Advanta Corp. Sec. Litig., 180 F.3d 525,

539 (3d Cir. 1999)).

Allegations of GAAP violations will not give rise to a strong inference of scienter "unless

plaintiffs' complaint alleges 'more.'" PharmaNet, 720 F. Supp. 2d at 557. In other words, the

facts alleged must "'sufficiently indicate that defendants had clear reasons to doubt the validity

of the issuer's financials but, nonetheless, kept turning a blind eye to all such factual 'red

flags.'" Id. at 557 (quoting In re Intelligroup Sec. Litig., 527 F. Supp. 2d 262, 286 (D.N.J.

2007)).

Here, Plaintiffs allege that the "sheer magnitude of Defendants' fraud" supports a strong

inference of scienter. Pls.' Br. at 14. Plaintiffs point to no evidence by affidavit or otherwise

that a particular deficiency was "so obvious" that Defendants must have known. Instead, Plaintiffs only cite to the <u>consequences</u> of the internal control deficiencies, not to signs that should have alerted Defendants to their presence. For example, Plaintiffs highlight that Defendants experienced "'the worst conversion rate of any quarter in recent memory,' . . . due at least in part to the Company's assessment of its controls." <u>Id.</u> (quoting Am. Compl. at ¶ 29). They also note the Company's "nearly 50% drop" in stock price "following disclosure of the fraud" and the "massive" reallocation of staff resources needed to address the deficiencies. <u>Id.</u> But these facts are insufficient to show that the internal control weaknesses were "so obvious that [Defendants] must have been aware" of them when they performed their review. Moreover, Plaintiffs fail to allege facts setting forth the magnitude of the actual errors, and they consequently fail to support their allegation that the internal control deficiencies were so pervasive that the officers could not have missed them during a review. Plaintiffs' Amended Complaint also lacks any allegations of "red flags" that would have alerted Defendants to the internal control issues.

The case of <u>National Junior Baseball League v. PharmaNet Development Group</u>, 720 F. Supp. 2d 517, 557 (D.N.J. 2010), is instructive here. There, the plaintiff argued that the Amended Complaint "detail[ed] practices that could not possibly have had any legitimate business or accounting purpose, but instead reflect[ed] 'business nonsensicality' designed to make PharmaNet's financial condition appear more favorable." <u>Id.</u> at 557. The Court summarized that the plaintiff there, like in this case, "posit[ed] that Defendants' disregard for certain accounting practices were so obvious that they must have been aware of the wrongs." <u>Id.</u> The Court rejected the plaintiff's argument and concluded that "[s]uch conclusory, and indeed,

insufficient, allegations cannot raise an inference of scienter on the part of the Individual Defendants." Id.

Without alleging something "more,"—e.g., facts to support Plaintiffs' allegations that the magnitude of the internal control deficiencies made them "so obvious" that Defendants must have known about them after their review, or allegations that Defendants ignored "red flags"— Plaintiffs fail to plead a sufficient inference of scienter.

In addition, Plaintiffs allege that the core operations doctrine, Defendants' SOX Certifications, Deloitte's investigation, and individual Defendants' motive all support a strong inference of scienter. The Court will address each in turn.

## 2. The Core Operations Doctrine

The "core operations doctrine" provides that a plaintiff may be able to allege a strong inference of scienter by alleging "that a defendant made misstatements concerning the 'core matters' of central importance to a company." Martin v. GNC Holdings, Inc., __ F. App'x __ (3d Cir. 2018), No. 17-3303, 2018 WL 6505927, at *2. However, the doctrine "does not support a finding of scienter . . . absent some additional allegation of specific information conveyed to management and related to the fraud." Id. (internal quotation marks omitted); see PharmaNet, 720 F. Supp. 2d at 566 (rejecting core operations doctrine in absence of "other individualized allegations"); In re Amarin Corp. PLC, Civ. No. 13-6663, 2015 WL 3954190, at *12 (D.N.J. Jun. 29, 2015) (refusing to infer scienter from core operations doctrine "absent particularized allegations showing that defendants had ample reason to know of the falsity of their statements"); see also Rahman v. Kid Brands, Inc., 736 F.3d 237, 246 (3d Cir. 2013) (declining to apply core operations doctrine in the absence of allegations demonstrating that Defendants knew the information they disseminated was false). For the reasons expressed above, Plaintiffs

have failed to allege facts upon which the Court can conclude, for the purposes of this Motion to Dismiss, that Defendants knew their statements were false.

### 3. SOX Certifications

Under the Sarbanes-Oxley Act, principal executive and financial officers of public companies must make a number of certifications about their financials. See 15 U.S.C. §§ 78m, 78o(d), 7241(a)(4). Specifically, officers must certify the general truthfulness of the company's quarterly and annual reports and the establishment and adequacy of the company's internal controls. In re Intelligroup, 527 F. Supp. 2d at 287. However, "[a]n allegation that a defendant signed a SOX certification attesting to the accuracy of an SEC filing that turned out to be materially false does not add to the scienter puzzle in the absence of any allegation that the defendant knew he was signing a false SEC filing or recklessly disregarded inaccuracies contained in an SEC filing." In re Hertz Global Holdings, Inc., 905 F.3d 106, 118 (3d Cir. 2018). Again, for the reasons expressed above, Plaintiffs have failed to allege facts to support the conclusion that Defendants knew the information in the SOX Certifications was false.

### 4. Deloitte's Investigation

Plaintiffs allege that Deloitte's opinion expressed in the original 2016 10-K supports a strong inference of scienter. Pls.' Br. at 19. Specifically, Plaintiffs allege that Defendants "furnished false or misleading information to Deloitte in connection with the certification of the Company's internal controls because otherwise Deloitte would have discovered the insufficiencies during its audit." Id. (citing Am. Compl. at ¶ 69). But Plaintiffs allege no particularized facts in support of this conclusory allegation.

Moreover, some courts have found that unqualified opinions can raise an inference against scienter. See Roofer's Pension Fund v. Papa, Civ. No. 16-2805, 2018 WL 3601229, at

*19 (D.N.J. July 27, 2018) (considering unqualified opinions as raising "a strong inference that any errors were not so obvious that their publication demonstrates an intent to defraud investors") (internal quotation omitted); In re Hansen Nat. Corp. Sec. Litig., 527 F. Supp. 2d 1142, 1158 (C.D. Cal. 2007) (finding unqualified opinion "'highly probative' of an absence of scienter" (quoting In re IKON Office Sols., Inc., 277 F.3d 658, 669 (3d Cir. 2002)); see also Kushner v. Beverly Enterprises, 317 F.3d 820, 829 (8th Cir. 2003) (finding it "telling" that Defendants' "outside auditors did not question its accounting practices").

Without particularized allegations to support Plaintiffs' argument that Defendants intentionally withheld information from Deloitte, the Court rejects Plaintiffs' contention that the unqualified opinion supports an inference of scienter. This allegation is far too speculative. Without more, the Court finds more compelling the opposing non-culpable inferences that Defendants either: (1) disclosed all relevant information to Deloitte, and that Deloitte did not detect the internal control deficiencies; or (2) unintentionally withheld information about the internal control deficiencies because Defendants were not yet aware of the material weaknesses.

### 5. Individual Defendants' Motive

Plaintiffs acknowledge that motive is not dispositive in the scienter calculus. See Pls.' Br. at 21. They argue that, "together with all of the other indicia of scienter explained above, the Individual Defendants' desire to increase their compensation, including through artificially inflating the value of the company's stock," is indicative of scienter. Id. However, "[m]otives that are generally possessed by most corporate directors and officers do not suffice." Hull, 2017 WL 6493148 at *19 (internal quotation marks omitted). Plaintiffs must instead "assert a concrete and personal benefit to the individual defendants resulting from" the instant fraud allegations. Id. The motive Plaintiffs proffer—inflating stock prices for personal financial

gain—amounts to nothing more than "general motives to aid the company." See Avaya, 564
F.3d at 279 ("Corporate officers always have an incentive to improve the lot of their companies, but this is not, absent unusual circumstances, a motive to commit fraud."). Accordingly, the Court rejects Plaintiffs' argument that the Individual Defendants' motive supports a strong inference of scienter.

### 6. Collective Scienter

Under the doctrine of collective scienter, "a plaintiff can . . . plead an inference of scienter against a corporate defendant without raising the same inferences required to attribute scienter to an individual defendant." Rahman, 736 F.3d at 246. The Third Circuit has neither accepted nor rejected this doctrine. Id. Assuming the doctrine's applicability in this district, Plaintiffs' argument still fails.

To allege collective scienter, "the pleaded facts must create a strong inference that someone whose intent could be imputed to the corporation acted with the requisite scienter." Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital, 531 F.3d 190, 195 (2d Cir. 2008). Defendants repeat the same arguments discussed above in urging the Court to apply the doctrine of collective scienter. Specifically, Plaintiffs allege that Defendants represented that they had "engaged in a comprehensive effort to review, evaluate, and improve [the Company's] controls" while making "numerous contemporaneous misrepresentations regarding" the internal control review. Pls.' Br. at 22. These allegations fail to support the application of collective scienter for the same reasons discussed above. The more compelling inference is that the "contemporaneous misrepresentations" resulted from mere corporate mismanagement or negligence.

### 7. Failure to Plead a Strong Inference of Scienter

Based on a holistic review of the Amended Complaint, the Court concludes that Plaintiffs have failed to adequately plead scienter. For the purposes of this Motion, Defendants concede that their annual and quarterly financial reports contained misrepresentations. However, Plaintiffs have failed to sufficiently plead that the misrepresentations were conscious or reckless.

Plaintiffs set forth two potential theories of liability: (1) that Defendants lied about the performance or the depth of their internal control review; or (2) that Defendants performed the review and, based on the magnitude of the material weaknesses, must have been aware of the internal control deficiencies. As pled here, both theories are too speculative to support a strong inference of scienter. Plaintiffs fail to allege any particularized facts to support the conclusions that they lied about the review, that the "pervasiveness" of the internal control deficiencies was so great that Defendants could not have missed them, or that Plaintiffs were apprised of and ignored "red flags" that would have alerted them to the issues.

The additional arguments Plaintiffs advance in support of scienter—GAAP violations, the Core Operations Doctrine, SOX Certifications, Deloitte's unqualified opinion, and collective scienter—all require Plaintiffs to allege additional facts to demonstrate Defendants' knowledge of the fraud. Plaintiffs have failed to do so. Plaintiffs also argue that Defendants' motives support a strong inference of scienter, but they fail to plead anything beyond "general motives to aid the company." In sum, none of Plaintiffs' arguments are individually or collectively sufficient to support a strong inference of scienter.

## C. Count Two – Control Person Claim Against the Individual Defendants under § 20(a)

Section 20(a) of the Securities Exchange Act of 1934 creates a cause of action against individuals who exercise control over a "controlled person," including a corporation, that has committed a violation of Section 10(b). 15 U.S.C. § 78t(a); In re Suprema Specialties, Inc. Sec.

Litig., 438 F.3d 256, 284 (3d Cir. 2006).  Accordingly, liability under Section 20(a) is derivative of an underlying violation of Section 10(b) by the controlled person.  Avaya, 564 F.3d at 252. Because Plaintiffs have failed to state a claim for violation of § 10(b) against Defendants, Plaintiffs' § 20(a) claim against the Individual Defendants necessarily fails.  Count Two is dismissed.

IV.   CONCLUSION

For the reasons set forth herein, the Motion to Dismiss, ECF No. 28, is **GRANTED** and the Amended Complaint is **DISMISSED WITHOUT PREJUDICE.**  Plaintiffs shall be afforded thirty days to file a Second Amended Complaint that addresses the deficiencies set forth herein.

/s Madeline Cox Arleo
**Hon. Madeline Cox Arleo**
**UNITED STATES DISTRICT JUDGE**